Lee, J.
The first question to be considered in this cause is that arising on the exception taken on behalf of the appellant and others to the report of commissioner Wyatt, for want of legal notice. The report was returned on the 11th of October 1838; and this *667 exception was not made until the 24th of April 1845; upwards of six years afterwards, nor until after the cause had come on to he heard at the special term without objection, and been argued by counsel, and the opinion of the court pronounced against the parties so excepting. During this interval, and while the report was lying in the office, Holcombe, who was best acquainted with the various transactions in question, had departed this life. Under these circumstances it would have been proper for the court to disregard the exception. But in point of fact it appears from the report itself, and from the deposition of the commissioner which was afterwards taken, that due notice was acknowledged by the counsel for the appellant; and that the said counsel attended him during the time of taking the account, was informed by him of the principles on which the account was taken, and that he caused a special statement to be made in the report, gave strict attention to the business, and was perhaps better acquainted with the details than any other person interested. On every ground therefore, this exception was properly overruled.
I come next to consider the construction to be placed on the deed of trust from Harrison to the trustees Holcombe and Coleman, as to the manner in which the proceeds of the trust fund were to be paid out to the several creditors entitled thereto. It is contended by the appellant that no preference is given by the deed to any creditor or class of creditors, but that all come in pari passu.
In the exception taken by the appellant in the Circuit court, the appellant does not appear to have taken ground against the existence of any preference under the deed; but he insisted that the trustees, either as such or as individuals, stood in no better condition than other creditors having sureties for their debts,* and so the court expressly held in its decree. But it *668 is row insisted that no preference whatever is created by the deed in favor of any of the creditors provided for.
The deed conveys to the trustees Holcombe and Coleman, various subjects of property, real and personal, and choses in action, from the proceeds of which the trustees are to pay certain debts enumerated in the deed; and the surplus, if any, to be returned to the said Harrison. The deed then directs that the trustees “ shall so dispose of the said property that no security on the debts aforesaid shall suffer or be injured on account thereof.” And the trustees were to permit the said Harrison to enjoy such portion of the property as might not be necessary to be sold for the purposes aforesaid: and in case the said Holcombe and Coleman should be security for any debt not enumerated in that deed, they were to be indemnified as such sureties out of the property aforesaid.
It is true, as argued by the appellant’s counsel, that in general a deed of trust will not give priority to- one creditor or class of creditors, unless so provided -expressly or by proper implication; and in the absence of such a provision, the creditors will participate in the fund pari passu. And it is contended that the clause above cited was only intended to prescribe the times and manner in which the trustees should dispose of the property, with a view to the protection of the sureties, Harrison the grantor, being as it is alleged, under the belief that the trust fund was ample to meet all the debts intended to be secured. This inference as to Harrison’s impression, is drawn from the provision in the deed requiring the surplus after satisfying the object of the trust, to be returned to him, a provision to be found in almost all trusts of this character, and often doubtless inserted without regard to the amount of the debts and the value of the property conveyed; and sometimes as a matter of form perhaps, *669 even in cases in which it is perfectly certain that the property conveyed will be wholly inadequate to the payment of the debts provided for. But even if that inference is properly to be drawn in this case, still some meaning is to be assigned to the clause in question, more than that of a mere direction as to the manner of disposing of the subject. If there were no such clause in the deed, the trustees might do precisely all that this” clause directed, if its meaning is to be restricted to the sense contended for by the appellant. Something more, that was not yet expressed, must have been intended. To give it any meaning, it seems to me that it must be construed as creating a preference in favor of the security debts; the grantor in this case, as is a very common practice, desiring and taking care that those who had befriended him by becoming his sureties, should be indemnified before his other debts should be paid. The necessaiy operation and effect of the clause is to create a preference; for if, as seems to be conceded, the trustees could at any time sell property enough to prevent any surety from suffering or being injured, no creditor whose debt had been paid from the proceeds of property sold under this provision, for the purpose of saving the security harmless, could be called on to refund, if the fund should prove inadequate to pay the debts for which no one was bound as security. I think, therefore, that the deed of trust divided the creditors of Harrison into two classes; first, the creditors for whose debts sureties were bound; and second, the other creditors; the former, including those creditors of Harrison, to whom the trustees might stand bound as'his sureties, having preference to the latter, but coming in pari passu as among themselves; and the latter coming in pari passu as among themselves, for the surplus, if any, after the debts of the former were satisfied. I am of opinion, therefore, the Circuit court did not err in the construction placed upon the provisions of the deed.
*670 The next and a most material enquiry in this cause, is as to the manner in which the trustees are-to be charged with the trust subject; whether jointly with the whole, or separately with several portions thereof ; and if to be charged jointly with a part and severally with the rest, what items are to be so severally charged, and to whom ? The commissioner, in making up his account in this cause in 1836, charged Coleman with a portion of the trust fund, to wit, the amount of his own purchases, certain bonds given by purchasers of property at the sale, the value of a slave called Tipton, B. Harrison’s purchase, and with the price of three slaves sold to Garland, Walton & Penn; and he charged Holcombe with the residue of the trust effects. It is insisted by the counsel for the appellant that he erred in thus separating the accounts, and that Holcombe should be charged conjointly with Coleman with all those items thus charged to the latter separately.
It appears that in the year 1822, Harrison, the debtor, filed a bill against his trustees and creditors, charging the former with a breach of the trust reposed in them, and calling upon them to give an account of all their transactions as trustees in the premises. To this bill Holcombe and Coleman filed a joint answer in May 1822, in which they speak of their transactions, sales and collections, as having been conducted jointly, and in effect admit their joint liability for all the proceeds of the trust subject. Nothing is intimated whatever in any part of it of any separate action on the part of either trustee for which he was to be severally answerable. An account was directed to be taken in the cause by a commissioner; and to enable him to perform this duty, Holcombe filed with the commissioner a book containing an account of sales made by him and Coleman as trustees, and their account of the trust fund, and how disposed of, all which was in the handwriting of Holcombe. In this book, and in the *671 account and report made by tbe commissioner, no discrimination is made between items to be charged to the one or the other of the trustees, but all stand alike chargeable to both. Nothing whatever is intimated at that time of any necessity or propriety of a separation of the accounts, but a joint liability for the whole trust fund would seem to be distinctly admitted. This suit was dismissed in 1826 for want of security for costs, but no exception was ever taken to the report of the commissioner. In May 1823, Elias Wills, who was security for Harrison in the debt due Edmond Taylor & Co., filed a bill and obtained an injunction against the trustees, charging them with default and neglect of duty, and seeking to compel them to give security for the faithful performance of their duty as trustees, or to take the trust fund out of their hands. Holcombe thereupon deposited bonds in the Bank of Virginia, to be collected and applied to the payment of the debt due Taylor & Co., and this suit was abandoned by the said Wills. The appellant afterwards filed his bill in this cause in November 1823. Process was executed and a decree nisi taken in July 1824. The bill charged a joint liability for the trust fund, but Holcombe failed to file his answer, and in February 1835 an order was made for an account upon the bill then taken for confessed as to Holcombe. Upon the taking of this account in 1836, the first intimation is given that there should be a separation of accounts ; and the commissioner adopts the statement which he says was made by Coleman, (who had in the mean time become insolvent,) as to the items which he charged to him, charging Holcombe with the residue only. During all this period, from 1822 to 1836, the creditors of the trust fund were justified by the acts of Holcombe in thinking him liable conjointly with Coleman for all these items ; and were thus prevented from taking any measures to protect the trust fund against the failing *672 circumstances of Coleman. It appears, indeed, that Holcombe was the acting manager and fiscal agent throughout the whole business. Coleman states in his answer and in his deposition, and also in a petition sworn to and filed by him, that he had given up the trust subject to the entire control and management of Holcombe. Holcombe kept the accounts, took the bonds given for the property sold," and held them in his possession; and it must be inferred that all such .as came to Coleman’s possession he must have received from Mm.
Without therefore enteiing into an examination of the general doctrine of the court of equity in regard •to the manner in which joint trustees should be charged in the settlement of their accounts, I cannot but think that, considering the nature and character of the trust reposed by the deed of Harrison, manifestly intended to be exercised jointly, and the acts and conduct and declarations of the trustee Holcombe, he ought to be charged conjointly with Coleman, with all the items which the commissioner held Coleman alone accountable for; that the creditors had a right to consider and treat Mm as so chargeable, and that this right could not be in any degree modified or affected by the admissions which he states were made by Coleman, that he alone was chargeable with those items; and that those declarations, however effectual they might be, even if conclusive against Coleman in the settlement of the account between him and Holcombe, yet as against the creditors of the trust fund, are not to be received in evidence, or serve to discharge Holcombe from liability on account of the matters to which they relate.
Thinking it apparent in this general view of the subject that Holcombe should be charged jointly with Coleman with all the items (including Coleman’s purchases at the sale) which the commissioner undertook to charge to Coleman separately, I shall not stop to *673 consider the special grounds and reasons applicable to each particular item, and tending to show the propriety of charging Holcombe with it also ; though many ■ such suggest themselves upon the record.
I proceed next to consider the subject of the sale of the three negroes to Garland, Walton & Penn. This sale, it appears, was made by Coleman under the impression, as he states, that it had been agreed to by Holcombe, and was only consummated by him. At the time of the sale the negroes were hired, and they were to be delivered at Christmas following. Before the time at which they were to be delivered, Holcombe was apprised of what had been done, but failed to express his dissent or to take any measures to prevent the sale from being effected by the delivery of the negroes. He collected the hires of these negroes for that year, and doubtless could have controlled the possession. Coleman denies that he delivered the possession of the negroes, and as Holcombe had the chief management of the business, it cannot be doubted that he suffered the negroes to go into the possession of the purchasers, and in effect ratified the sale and became jointly responsible for the transaction with Coleman. That this sale was to be regarded as the act of both is further shown by the statement made to commissioner Benagh when taking the account in the case of Harrison v. Carter. Por Holcombe directed the commissioner to report that the trustees (not Coleman) had sold three negroes to Garland at the price of 2050 dollars, the negroes to be delivered at Christmas. This was in September 1822, and when he had ample opportunity to stop the sale, as it was his duty to do. The answer of Holcombe some seventeen years after-wards explaining this statement, cannot have the effect of overcoming its force and effect, and giving a different character to the transaction. I think, therefore, that if Coleman is chargeable with the value of these *674 negroes, Holcombe must bear the burden along with him. The commissioner did charge Coleman with their value, but the court sustained his exception, and held that he ought not to be charged therewith.
The sale of these three negroes was not for cash, but upon a credit for a period which is not ascertained, and no security was taken for the purchase money, nor even the bond of the purchasers of the property. Coleman indeed says that a bond was or was to be given with Samuel Garland who was the agent and counsel of the parties, as security; but this is denied, and it is not proven by any conqietent testimony.
It is true that courts of equity look with indulgence upon the acts of trustees and other fiduciaries, and have not been disposed to lay down too stringent a rule by which to hold them responsible personally for losses sustained in the management of the trust fund. The doctrines on this subject were referred to with some detail in the case of Elliott v. Carter, decided during the present term of this court, supra 541. But however favorably disposed the court may be towards trustees, I apprehend it would be going farther than any court has yet gone, to hold a trustee excusable for selling personal property belonging to the fund upon a credit, without taking security deemed good at the time for the purchase money. Indeed, the question which has been made on a similar subject is, whether a trustee would be justified in suffering money to remain on personal security alone. But from all the cases on the subject I deduce, that to suffer money due the trust fund to remain on the mere personal credit of the debtor, even though the party who created the trust had left it in that state; or to sell property on the mere personal credit of the debtor will be such a dereliction of duty on the part of the trustee as to make himself responsible if the debt be lost. Harden v. Parsons, 1 Eden’s R. 145, and note; Waller v. Sym *675 monds, 3 Swanst. R. 82, and note; Lawson v. Copeland, 2 Bro. C. C. 156; Powell v. Evans, 5 Ves. R. 839; Tebbs v. Carpenter, 1 Madd. R. 162—290.
It is in vain to say that the purchasers Garland, Walton & Penn were highly responsible and wealthy at the time of this transaction, and abundantly good for all their engagements. No distinction is admitted having its foundation in the situation and circumstances of the purchaser. However ample his means might appear to be at the time, prudence would dictate that he should be required to give security for the amount he may owe. Nor do I think that the fact that the purchaser may be a mercantile firm composed of several different individuals, all- of whom may be at the time perfectly responsible, will release the trustee from the duty of requiring security to be given. The fact that there is one bound as surety merely for the debt gives an assurance, in addition to his mere responsibility, that the debt will be collected when due ; and if the creditor fail to proceed he may compel him by a bill quia timet, or a notice under our act of assembly.
We do not learn from the record what was the terms of the credit on which these slaves were sold. If it was for the usual period of one or two years, why was not the debt. collected ? Why suffered to remain in the hands of Garland, Walton & Penn ? If, as may be possibly inferred from the fact that the purchasers were creditors of the trust fund, though of the second class, it was intended that the • credit should continue till the settlement of the trust, it was an undue and improper credit; or at the least, it was the bounden duty of the trustees to take security; and the rather, because it appears from their answer to the bill of Harrison, they knew, or had reason to believe, that the trust fund would prove inadequate to the payment of the debts, before they made this sale to Garland, Walton & Penn. '
*676 I see nothing in the fact that Samuel Garland, who chanced to be the attorney of the appellant, took a part on behalf of Garland, Walton & Penn, for whom he was also attorney, in bringing about the sale to them of these negroes ; and that the appellant and the said Garland, Walton & Penn have united as complainants in this cause. The appellant could not be bound by the act of Garland on behalf of others, nor could his authority from the appellant be construed to extend so far as to sanction a breach of trust which he may have induced the trustees to commit on behalf of others. And although these parties join in the bill in this cause, yet they make several allegations, and these are to be regarded as constituting a separate bill on behalf of each.
I think therefore that the Circuit court erred in not holding both the trustees jointly responsible for the price of the negroes sold to Garland, Walton & Penn.
I come next to consider the subject of what is called the “ Calloway compromise.” Harrison had purchased a tract of land of one Calloway at the price of 12,000 dollars; but before the title was conveyed, it was ascertained that it was defective, and Harrison brought a suit to rescind the contract and recover back the amount he had paid. He claimed to have paid about 4000 dollars, though Calloway in his answer only admitted payments to the amount of 2480 dollars and 14 cents. Pending this suit, Harrison made his conveyance in trust to the said Holcombe and Coleman, including the claim set up in that cause. Shortly after-wards a decree was pronounced rescinding the contract between Harrison and Calloway, and requiring the latter to refund to the former the amount of purchase money received by him with interest, first deducting the rents and profits of the land during the time it was held in possession by Harrison under the purchase. After this decree had been rendered, a compromise was *677 made by Holcombe, as he states, with Calloway, by which it was agreed that the appeal which Calloway had taken from the decree should be dismissed, and that Holcombe should take the land, pay Calloway 2500 dollars, and pay the amount of the decree. And by this arrangement the decree was satisfied and adjusted. Holcombe afterwards sold the land for a sum sufficient to pay the 2500 dollars to Calloway and 2000 dollars to the trust fund, and yet leave a considerable balance for the profit on the transaction. This profit it is insisted, should be carried to the credit of the trust fund; while it is contended on the part of Holcombe, that this transaction was a purchase by him individually of the land from Calloway; and that he is entitled to claim the benefit of it as such. And the Circuit court sustained the pretensions of Holcombe in this respect.
It is a well settled doctrine that where a trustee or other person standing in a fiduciary character, makes a profit out of any transactions within the scope of his agency, that profit will belong to the cestui que trust. Fawcett v. Whitehouse, 1 Russ. & Mylne 132, 4 Cond. Eng. Ch. R. 357; Com. Dig. Chancery, 4 W. 30. And if a trustee should lay out money in land when not so authorized by the terms of the trust, the cestui que trust has an option either to take the property or to claim the money. 2 Story’s Eq. Jur. § 1260, et seq. § 1262; 2 Spence’s Eq. 944. And it seems to me that Holcombe was brought in the transaction in question, within the influence of the rules upon the subject. He availed himself of his office of trustee to make this compromise: the thing compromised was the decree in favor of Harrison, part of the trust fund. He takes the land of Calloway in satisfaction of the decree, paying also out of it 2500 dollars to Calloway. He sells this land, and after he had received the proceeds, it may be inferred he credits the trust fund with *678 2000 dollars. Why did he not credit this sum at the time of the compromise ? He says he bought the land on his individual account and with his own means. Yet we see that at the time of this arrangement he had a large amount of the trust funds in his hands. The principal circumstance which he states as a color for the individual character he seeks to give to the transaction is that he incurred a personal responsibility by warranting the title to the land to the purchasers to whom he sold it; but in this it appears that he was entirely mistaken, doubtless through an error of memory, for it appears that the deeds that he made to the purchasers were all with special warranty against himself and his heirs, just as deeds made by trustees usually are. Harrison in his answer states that he made the compromise with Calloway, and that the proceeds were for the benefit of the trust fund; but that Holcombe, for causes unknown, had caused the deed to be made to himself individually, instead of as trustee. He denies the character imputed to this transaction by Holcombe; and says that the amount to be paid to Calloway, which he states at 2000 dollars instead of 2500 dollars as stated by Holcombe, was paid out of the proceeds of the sale of the land. It will be observed that Holcombe directed commissioner Benagh in September 1822, to report to the court that an arrangement had been entered into with Calloway that would, if finally closed, produce to the trust fund a sum between 2000 and 3000 dollars. It would not appear from this that he contemplated an individual transaction, but himself supposed that the profit would enure to the benefit of the trust fund. The arrangement was consummated shortly after ; and he seems to have sold most of the land immediately after, for four of his deeds bear date in October 1822, and the fifth in February 1824; and yet he never credits the fund with the sum which he *679 thought proper to allow, until February 1826, when it may be supposed he had collected the proceeds of his sales. The sum for which he credited the fund was - an arbitrary amount, fixed by himself, less than that he had stated would be the yield of the arrangement to the fund; although in his answer he states that all the fund could claim was 1576 dollars.
These views militate strongly against the pretensions of Holcombe; but there is yet another which I think conclusive.
The principle on which the prohibition to one standing in a fiduciary character to deal with the trust subject with reference to his own individual interests, rests, is that not only would it be contrary to the design under which he has obtained the control of the subject, but he would be placed in such a situation as that his interests might, in reference to the conduct of the trust, by possibility come into conflict with those of the cestui que trust. 2 Spence’s Eq. 299 ; 2 Fonb. 189. And this case furnishes a most apt illustration of this principle. It will be remembered that at the time this compromise took place, the amount due from Calloway to Harrison was unascertained, depending upon an account ordered by the court to be taken of the amount paid by Harrison, upon the purchase, on the one hand, and the rents and profits of the property during the time it was held by him on the other. Now in this state of the case, it was Holcombe’s bounden duty to see that the account was taken correctly, and that the full amount paid was allowed, and not more than the just value of the rents and profits charged against it so as to make the net balance accruing to the fund as large as might be. But after the compromise, as he is to pay according to his account, only what is actually due to the trust fund, it of .course becomes his interest to reduce the amount as much as possible; and thus that very conflict between duty on the one hand *680 and interest on the other, is brought about, which the court of equity, by its rules, seeks to avoid.
It is in vain to say that the arrangement was a judicious one, yielding more to the fund in the credit actually given, than it was really entitled to. The court will not go into that enquiry, but requires that the whole profit yielded shall be accounted for.
I think, therefore, the Circuit court erred in not requiring Holcombe to bring to the credit of the trust fund all the profits realized from the arrangement made with Calloway.
It results from the foregoing, that the court also erred in decreeing against the appellant for the supposed excess which he had received over and above the amount to which he was declared entitled: because upon the true construction of his bond, the appellant was only bound to refund in case of a deficiency of the trust fund; and no such deficiency had been shown by any account stated upon the principles which, according to my view, should govern the case.
In the view I have taken of this case, it is rendered unnecessary to consider several of the questions discussed in the argument, their solution being embraced in the opinions I have already expressed. But as I have expressed the opinion that Holcombe should be charged conjointly with Coleman with the various items charged by the commissioner against the latter separately, upon his admissions, as the commissioner states,fit is proper I should add that the parties should he credited upon the account of the trust subject, not only with what they may have properly paid out in the proper administration of the trust subject, but also with any portion of the trust property or any debt belonging to it, that they may shew has been lost to the fund without any neglect of duty or other default on their part.
I am of opinion to reverse the decree so far as it *681 affects the appellant, and to remand the cause with directions to the Circuit court to ascertain the amount that may be due to Miller, he being the only appellant, by causing a report to be made upon the principles hereinbefore declared; and otherwise to proceed according to the same.
The other judges concurred in the opinion of Lee, J.
The decree was as follows:
The court having maturely considered the transcript of the record of the decree aforesaid, together with the argument of counsel thereupon, is of opinion, that the exception taken by the appellant to the report of the commissioner on the 24th of April 1845, was unduly and improperly delayed, and was moreover unfounded in point of fact; it appearing that the counsel for the appellant had received notice, and did in fact attend the commissioner when taking the accounts; and that the said exception was therefore properly overruled by the Circuit court.
And the court is further of opinion, that upon the true construction of the deed of trust executed by Nicholas Harrison to the said Holcombe and Coleman, preference was given out of the proceeds of the trust subject, to those creditors thereby secured, for whose debts other persons were bound as sureties ; and that the Circuit court did not err in holding that such preference should be allowed;. and that the debts, if any, for which either or both of the said trustees were bound as sureties, should stand on the. same footing as the other security debts secured by said trust deed: This court being further of opinion, that all the creditors for whose debts others were bound as sureties, should come in pari passu as among themselves;; and that the other creditors should come in pari passu *682 among themselves for the surplus, if any, left after satisfying the preferred creditors.
But the court is further of opinion, that the trustee Holcombe should be charged conjointly with Coleman, with all those items which the commissioner charged to Coleman separately, upon the admissions made as he states by the said Coleman, that he alone was accountable for the same.
And the court is further of opinion, that the said trustees should be charged jointly with the sum of 2050 dollars, the amount of the sale of the three negroes sold to Garland, Walton & Penn, as of the 25th December 1822.
And the court is further of opinion, that the said Holcombe should be charged with the whole amount of the proceeds of the sales of the land taken by him from the said Calloway, (all proper costs and expenses first deducted,) after allowing the said sum paid by him to said Calloway, instead of with the sum of 2000 dollars, which was charged -to him by the said commissioner by his direction; this court being of opinion that said Holcombe must be regarded as having made the arrangement with Calloway as trustee, or on account of the trust fund, and not individually on his own account ; and that he must therefore account to the trust fund for all the profits accruing from said arrangement.
And the court is further of opinion, that upon the true construction of the bond given by the appellant on receiving a portion of the trust fund, he was only liable to refund any portion thereof upon its being ascertained that there was a deficiency of the trust fund to satisfy his whole debt; and that as no such deficiency had been ascertained by any account stated upon the principles which in the opinion of this court should govern it, it was improper to render a decree against him for the said sum of 858 dollars 9£ cents, with interest, or any other sum at that time.
*683 Wherefore the court is of opinion that the said decree is erroneous: and it is therefore ordered and decreed that the same be reversed and annulled so far as it affects the said appellant; and that the said Charles L. Mosby, out of the assets of his testator in his hands, to be administered if so much he hath, and the said Kobert L. Coleman do pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here. And it is further ordered that said cause be remanded to the said Circuit court, with directions to ascertain the amount that maybe properly due out of the trust fund to the appellant, by causing an account to be stated upon the principles hereinbefore indicated, (the appellant being the only party appealing from said decree, and alone entitled to a restatement of said account and to a decree founded thereupon,) in which account the said trustees are to be entitled to credit for all sums disbursed by them in the proper administration of the fund, and for any part of the trust subject or any debt belonging to it, that they may show has been lost without any default on their part; and for further proceedings according to the views and principles hereinbefore declared. Which is ordered to be certified to the said Circuit court of Lynchburg.